# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                              No. CR 10-0244 JB

MYRON ROBERT LEE,

      Defendant.

## MEMORANDUM OPINION[1]

**THIS MATTER** comes before the Court on the United States Probation Office's ("USPO") Amended Petition to Revoke Supervised Release, filed June 10, 2015 (Doc. 45)("Petition"). The Court held a revocation hearing on July 15, 2015. The primary issue is whether the Court should sentence Defendant Myron Robert Lee to a sentence at the low or high end of the Sentencing Guidelines range of 3 to 9 months. The Court has reviewed the violation report, and has carefully considered the policy statements of Chapter 7 of the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a). For the reasons stated at the hearing, the Court concludes that a sentence of 9-months imprisonment and 24-months supervised release best reflects the statutory purposes of sentencing and of supervised release.

---

[1]In its Sealed Memorandum Opinion, filed September 14, 2015 (Doc. 67)("Sealed MO"), the Court inquired whether the parties had any proposed redactions to protect confidential information within the Sealed MO before the Court published a public version of the Sealed MO. See Sealed MO at 1 n.1. The Court gave the parties 14 calendar days to provide notice of any proposed redactions. See Sealed MO at 1 n.1. The parties have not contacted the Court or made any filings within CM/ECF to indicate that they have any proposed redactions. Consequently, the Court is now re-filing the Sealed MO in an unsealed form.

## FACTUAL BACKGROUND

First, the Court will outline Lee's past criminal history.  Second, the Court will describe some of Lee's other personal characteristics.  Last, the Court will describe the underlying offense that put Lee in front of the Court in the first instance.  The Court finds all facts by a preponderance of the evidence, as 18 U.S.C. § 3583(e)(3) requires.

1.      **Lee's Criminal History Up to the Underlying Crime of Conviction in This Case.**

Lee was convicted on four counts -- threatening, disorderly conduct, criminal damage, and battery -- in Navajo Tribal District Court in June 2008, which received no criminal history points in the calculation of Lee's criminal history.  See Presentence Investigation Report ¶ 53, at 11 (disclosed August 11, 2010)("PSR").  Regarding Lee's 2008 tribal conviction, the PSR provides the following information:

> According to the offense report completed by the Crownpoint, New Mexico Police Department, an officer responded to a call of an intoxicated individual, later identified as [Lee], who was acting out of control.  Upon arriving at the location, officers observed several family members holding down the defendant. The officer heard the defendant yelling obscenities including, "I'm going to kill all of you!"  The officer attempted to handcuff the defendant while he was being held down; however, he kept resisting and struggling.  Eventually, the officer was able to restrain [Lee] and placed him in the patrol unit.  At this time the defendant began hitting the window with his head.  The defendant was warned to stop banging his head on the window, but he continued.  Therefore, the officer pepper sprayed him for his safety.  The defendant's mother explained the defendant became very angry after she refused to allow him to drive her vehicle.  [Lee] was physically restrained by family members after he became physically aggressive toward his mother.  Even after being restrained he managed to hit his mother's lip area.  [Lee] was booked into the adult detention center in Crownpoint, New Mexico.

PSR ¶ 53, at 11.  The Tribal Court sentenced Lee to one year of probation, which was set to expire on February 23, 2010.  See PSR ¶ 53, at 11.

In addition, Lee was also arrested or had interactions with law enforcement five other times before being arrested for the underlying crime of conviction in this case.  See PSR ¶¶ 55-60, at 11-13.  These contacts with law enforcement involved: public intoxication, criminal trespass, criminal nuisance, disturbance, and reckless burning.  See PSR ¶¶ 55-60, at 11-13.  In December 2006, Lee was suspected of being intoxicated at Wingate High School in Fort Wingate, New Mexico.  See PSR ¶ 55, at 11-12.  After arriving on the scene, an officer from the Crownpoint New Mexico Police Department made contact with Lee.  See PSR ¶ 55, at 12.  "The officer conducted a field sobriety test, which defendant completed without any problems.  The defendant was instructed to return to his dorm room."  PSR ¶ 55, at 12.  Again, in December, 2006, Lee was arrested for criminal trespass and criminal nuisance, after being involved with two other male juveniles on school grounds when they were supposed to be off school premises.  See PSR ¶ 56, at 12.  Regarding this incident, the PSR states:

> According to the offense report received from the Crownpoint, New Mexico Police Department, [Lee] and two other male juveniles were on school grounds when they were supposed to be off school [sic].  While on the school grounds a staff member noticed a strong odor of marijuana emitting from their person.  As the staff member attempted to search the three individuals they ran off.  The staff member managed to detain one of them and shortly after, [Lee] along with the other individual returned.  The officer attempted to question the individuals, but they were uncooperative.  They were arrested and transported to the youth detention center in Tohatchi, New Mexico.

PSR ¶ 56, at 12.

Later, in April, 2007, officers were requested at Tohatchi High School in Tohatchi, New Mexico, after Lee was sent to the principal's office following an incident involving a teacher.  See PSR ¶ 57, at 12.  Regarding the April 2007 incident, the PSR states:

> According to the offense report received from the Crownpoint, New Mexico Police Department, officers were requested at the Tohatchi High School in Tohatchi, New Mexico.  Upon arriving, officers spoke to the principal who reported a teacher encountered [Lee] in the courtyard and asked him to get to

> class.  [Lee] responded with obscenities including, "You better watch out, I know
> where you live."  [Lee] refused to go to class; therefore, he was escorted to the
> principal's office.  While waiting to speak to the principal he hit the wall with his
> fist.  [Lee] was not arrested; however, his parents were contacted.

PSR ¶ 57, at 12.  One month later, in May, 2007, Lee was allegedly involved in a more serious

incident.  See PSR ¶ 58, at 12-13.   The PSR explains:

> According to the offense report received from the Crownpoint, New Mexico
> Police Department, an officer was dispatched to a residence in reference to a
> fight.  While en route the officer was informed the individuals involved in the
> fight had fled in a green sedan.  The officer arrived at the residence and spoke to a
> female who reported she was battered by three individuals.  The victim stated she
> was sitting in her living room, after drinking all day, when the defendant and two
> females, Margie and Marland, entered the house and proceeded to batter her.
> [Lee] and Marland took hold of her arms while Margie kicked her in the face
> three times.  The victim explained she has been dating Margie's ex-boyfriend;
> which is why she was targeted.

PSR ¶ 58, at 12-13.  The PSR also states that in November, 2008, Lee had contact with law

enforcement regarding a "reckless burning" in Crownpoint.  See PSR ¶ 60, at 13.  The PSR,

states, however, that "[t]he offense report regarding this offense could not be located.  No further

information is available."  PSR ¶ 60, at 13.  Finally, the Tribal Court cited Lee for the underlying

offense, discussed in subsection (3) of this opinion's factual background, on three counts: (i)

"Reckless Driving," (ii) "No Valid State License Required," and (iii) "Left of Center Violation."

PSR ¶ 59, at 13.  No complaint, however, was ultimately filed.  See PSR ¶ 59, at 13.

      **2.**     **Lee's Personal Characteristics.**

Lee was born on November 25, 1989 in Gallup, New Mexico.  See PSR ¶ 62, at 13.  His

parents divorced when he was fourteen, and neither one of them have remarried.  See PSR ¶ 62,

at 13.  Lee has stated that "his father was an abusive alcoholic; however, shortly after the divorce

his father stopped drinking."  PSR ¶ 62, at 13.  His mother has remained supportive of him

throughout his legal proceedings.  See PSR ¶ 62, at 13.  Lee also has three siblings, and he

maintains a good relationship with them.  See PSR ¶ 63, at 13-14.  He is a lifelong resident and member of the Tohatchi Navajo community, and he resided in Tohatchi before moving with his family to YaTaHey, New Mexico in 2009.  See PSR ¶ 64, at 14.

Lee is single, has no children, and has no history of mental or emotional problems.  See PSR ¶¶ 65-67, at 14.  He is also in good physical health, other than having his gall bladder removed in November, 2009.  See PSR ¶ 66, at 14.  Lee has, however, a long history of alcohol and substance abuse.  See PSR ¶¶ 68-69, at 14.  When Lee "was approximately 15 years old, he began consuming alcohol."  PSR ¶ 68, at 14.  During the PSR interview with Lee for the underlying offense, he reported that "he consumed alcohol on a bi-weekly basis, about a 12-pack at a time to the point of intoxication," and began smoking marijuana at the age of seventeen.  PSR ¶¶ 68-69, at 14.  Lee indicated, at that time, that he had last used alcohol and marijuana on the day of the underlying offense.  See PSR ¶¶ 68-69, at 14.  Lee also "denied any experimentation with any other drugs and stated he prefers to use marijuana."  PSR ¶ 69, at 14.

Lee remained sober and drug free from February 11, 2010, when he was placed on pretrial supervision, until the week before the Court sentenced him on October 13, 2010.  See PSR ¶ 69, at 14.  Lee's pretrial officer referred him to outpatient substance abuse counseling, and Lee attended weekly groups at The Evolution Group in Albuquerque, New Mexico.  See PSR ¶ 69, at 14-15.  Further, after being referred by the Tribal Court, Lee successfully completed a 365-day outpatient treatment program at the Navajo Nation Department of Behavioral Health Services in Tohatchi in January 2010.  See PSR ¶ 70, at 15.  Before that time, Lee had never received treatment for his alcohol and substance abuse problems.  See PSR ¶ 68, at 14.  Despite Lee's progress in "working on his sobriety and addressing issues regarding care and treatment" for twenty-three months, Lee relapsed during the week before his sentencing before the Court,

which took place on October 13, 2010.  See Transcript of Sentencing Hearing at 6:12-7:8 (taken

October 13, 2010)(Robbenhaar)("2010 Tr.").[2]

Regarding Lee's educational history, he was a student at Tohatchi High School in

Tohatchi and was scheduled to graduate in May 2010.  See PSR ¶ 71, at 15.  Lee was unable to

complete school, however, because he was arrested for the underlying offense.  See PSR ¶ 71, at

15.  According to the PSR, Lee had "expressed a desire to obtain his GED[,]" and "ha[d]

inquired about courses offered at Central Community College in Albuquerque, New Mexico;

however, he [never enrolled]."  PSR ¶ 71, at 15.  Lee was unemployed at the time the PSR was

disclosed, and he had last been employed during the summer of 2009 at the McKinley County

Humane Society in Gallup.  See PSR ¶ 72, at 15.  Previously, Lee had been employed, during the

summer of 2008, with Big Bear Bargains furniture store in Gallup.  See PSR ¶ 73, at 15.  Both

jobs paid Lee minimum wage.  See PSR ¶¶ 72-73, at 15.  Finally, during the summer of 2006,

"[Lee] reported he did volunteer work with his Chapter House in the community of Gallup, New

Mexico," where "he would clean up around the community and do landscaping work."  PSR ¶

74, at 15.  As of June 11, 2010, Lee had no assets, income, or credit history.  See PSR ¶¶ 76-77,

at 16.

### 3.     The Underlying Crime of Conviction in This Case.

On November 1, 2008, the Navajo Nation Ambulance Services reported a two vehicle

head-on collision that occurred in Tohatchi.  See PSR ¶ 5, at 3.  According to witnesses, a "2006

Mitsubishi was traveling southbound on U.S. Highway 491 when it appeared to lose control,

swerving onto the shoulder of the road."  PSR ¶ 5, at 3.  As "the driver attempted to get back

---

[2]The Court's citations to the transcript of the 2010 sentencing hearing refer to the court
reporter's original, unedited version.  Any final transcript may contain slightly different page
and/or line numbers.

onto the proper lane, he over-corrected, causing the vehicle to rise briefly on two wheels."  PSR ¶ 5, at 3.  The vehicle "swerved across the roadway onto the northbound lanes, causing a head on collision with [a] 1999 Buick Sedan," which was being used as a taxi.  PSR ¶ 5, at 3.

When officers arrived at the scene of the accident, the entire front end of the 1999 Buick Sedan was missing, and the vehicle was on fire.  See PSR ¶ 5, at 3.   The witnesses reported that they observed a male, later identified as Lee, exit the 2006 Mitsubishi.  See PSR ¶ 6, at 3.   "Lee was observed staggering across the road and fell to the ground on the southbound side of the road."  PSR ¶ 6, at 3-4.  The witnesses asked if Lee was all right, and he "repeated several times, 'I'm sorry.  I didn't mean it.'  He also stated, 'I was only going to the store.'"  PSR ¶ 6, at 4.  The witnesses reported: "Lee appeared intoxicated."  PSR ¶ 6, at 4.  Lee "complained of pains in his side and was transported to the Gallup Indian Medical Center in Gallup, New Mexico."  PSR ¶ 10, at 4.  Officers made contact with him there, and Lee consented to a blood alcohol test.  See PSR ¶ 12, at 5.  The test later revealed that "Lee had a .14 blood alcohol level."  PSR ¶ 12, at 5.

The driver in the Buick Sedan was Bernadette Zepeda, and the passenger was Stephanie Simone.  See PSR ¶ 7, at 4.  The taxi service was transporting Simone home.  See PSR ¶ 11, at 4.  Following the accident, Zepeda was "pinned behind the steering wheel.  She was eventually extracted from the vehicle with visible injuries to her legs.   Ms. Zepeda was unable to comprehend she was bleeding from her mouth."  PSR ¶ 7, at 4.  The passenger, Simone, was found "lying in the back seat of the vehicle with visible injuries to her legs and she complained of pains in her lower back."  PSR ¶ 10, at 4.  Both women were "transported to Rehoboth McKinley Christian Hospital in Gallup, New Mexico, by ambulance, where they were stabilized."  PSR ¶ 7, at 4.

Zepeda was subsequently air lifted to the trauma center at the University of New Mexico Hospital in Albuquerque, New Mexico.  See PSR ¶ 8, at 4.  Shortly after arriving, Zepeda "slipped into a coma due to severe head trauma."  PSR ¶ 8, at 4.  She remained in a coma for fourteen days, and sustained a broken right wrist, a shattered right ankle, a head injury, and her left leg was broken in thirteen places.  See PSR ¶ 10, at 4.  Zepeda "now walks with a limp, has a metal rod in her left leg and suffers short term memory loss" because of her injuries from the accident.  PSR ¶ 8, at 4.  She also contracted a MERCA[3] staff infection while she was hospitalized, which became serious and had to be treated with antibiotics.  See PSR ¶ 8, at 4.  Zepeda was hospitalized for approximately ten weeks before she was released to a rehabilitation center.  See PSR ¶ 8, at 4.

Simone was ultimately air lifted to Denver Health in Denver, Colorado, where she underwent a complicated pelvic surgery.  See PSR ¶ 9, at 4.  "Her entire pelvis was crushed when her femurs were pushed through her pelvis during the collision; therefore, it was replaced with a titanium pelvis."  PSR ¶ 9, at 4.  Simone also "sustained a completely dislocated left foot, which has permanent bone damage, two fractured tibias, a concussion, lacerations to her left and right foot and nerve damage to her right hand."  PSR ¶ 9, at 4.  Simone remained in the hospital recovering for approximately five and one-half months.  See PSR ¶ 9, at 4.  She then returned to Albuquerque, New Mexico, where she underwent pelvic surgery.  See PSR ¶ 27, at 7.

For his involvement in the head-on collision, on January 28, 2010, Lee was indicted on two counts of Crime in Indian Country, Assault Resulting in Serious Bodily Injury, in violation

---

[3]MERCA is another name for methicillin-resistant *Staphylococcus aureus* ("MRSA"). "MRSA is a bacteria that is resistant to many antibiotics.  In the community, most MRSA infections are skin infections.  In medical facilities, MRSA causes life-threatening bloodstream infections, pneumonia, and surgical site infections." *Methicillin-resistant Staphylococcus aureus (MRSA) Infections*, CENTERS FOR DISEASE CONTROL AND PREVENTION, http://www.cdc.gov/mrsa/index.html (last visited Sept. 14, 2015).

of 18 U.S.C. § 1153 and 18 U.S.C. § 113(a)(6).  See Indictment at 1, filed January 28, 2010 (Doc. 2).  On May 20, 2010, Lee pled guilty, without a plea agreement, straight up to both counts of the indictment at a hearing before the Honorable W. Daniel Schneider, United States Magistrate Judge.  See Plea Minute Sheet at 1, filed May 20, 2010 (Doc. 23); Judgment at 1, filed October 29, 2010 (Doc. 40)("2010 Judg."); 2010 Tr. at 8:1-3 (Robbenhaar).  The Court held a sentencing hearing on October 13, 2010.  See Sentencing Minute Sheet at 1, filed October 13, 2010 (taken October 13, 2010)(Doc. 38)("Minute Sheet").  The guidelines recommended an imprisonment range of 33 to 41 months.  See 2010 Tr. at 7:18-23 (Robbenhaar); id. at 14:18-20 (Court).  The Court sentenced Lee at the low end of the range, to 33-months imprisonment and 36-months supervised release.  See Minute Sheet at 1; 2010 Judg. at 2-3; 2010 Tr. at 16:23-18:1 (Court).  The 36-month period of supervised release commenced on February 21, 2012, and was scheduled to expire on February 20, 2016.  See Petition at 1.

As part of Lee's supervised release, the Court ordered him to comply with the standard and mandatory conditions of supervised release, and with six special conditions.  See 2010 Judg. at 3-4; 2010 Tr. at 18:1-19:15 (Court).  Among others, standard condition 3 required Lee to "answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer," while standard condition 11 directed Lee to "notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer."  2010 Judg. at 3.  Of the six special conditions that the Court imposed, four are at issue here:

> [1.] The defendant must participate in and successfully complete a substance abuse treatment program which may include drug testing, outpatient counseling, or residential placement.  The defendant is prohibited from obstructing or attempting to obstruct or tamper, in any fashion, with the collection, efficiency and accuracy of any substance testing device or procedure.  The defendant may be required to pay a portion of the cost of treatment and/or drug testing as determined by the Probation Office.

[2.] The defendant must participate in an educational or vocational program as approved by the probation officer.

[3.] The defendant must refrain from the use and possession of alcohol and other forms of intoxicants.  He must not frequent places where alcohol is the primary item for sale.

[4.] The defendant will make monthly restitution in the amount of $126,120.87.  The restitution will be paid monthly of no less than 10%, and no more than 15%, of the defendant's monthly income if the defendant is unable to pay immediately.

2010 Judg. at 4-5; 2010 Tr. at 18:1-19:19 (Court).

## PROCEDURAL BACKGROUND

Lee's 36-month period of supervised release commenced on February 21, 2012, and was scheduled to expire on February 20, 2016.  See Petition at 1.  Since beginning supervision, Lee has lived in Yatahey with his family.  See United States Probation Office's Sentencing Memorandum at 1 (disclosed July 7, 2015)("USPO Sentencing Memo").  From March 2013 to March 2014, he participated in outpatient substance abuse counseling with Connections, Inc. in Gallup, where he was diagnosed "as Alcohol and Cannabis Dependent."  USPO Sentencing Memo. at 1-2.  Later, in October 2014, Lee was referred to the Synergy Behavioral Health Center in Gallup for follow-up services with respect to his substance abuse.  See USPO Sentencing Memo. at 1.  During his time on supervised release, Lee "has not made progress towards obtaining his General Education Development (GED) or attended a vocational program."  USPO Sentencing Memo. at 2.  Lee has worked sporadically as a security guard, although he "recently reported he obtained employment as a potter and landscaper."  USPO Sentencing Memo. at 2.

On December 17, 2014, United States Probation Officer Kenneth Evans informed the Court that Special Agent Aaron Carp of the Federal Bureau of Investigation had contacted him regarding the death of Lee's girlfriend.  Carp had informed Evans that Lee and a female friend

were being investigated for the death.  There is some dispute as to what precisely Carp requested

from Evans.   <u>See</u> Transcript of Sentencing Hearing at 17:6-27:23 (taken July 15,

2015)(Robbenhaar, Court, Nayback)("2015 Tr.").  Plaintiff United States of America maintains

that the FBI was contacting Evans merely for "Lee's location, and his -- maybe his

relationships," and not for "any official files."  2015 Tr. at 26:2-9 (Nayback).  Evans, however,

informed the Court that the FBI wanted to look at or review the USPO's file on Lee.  Evans

sought guidance from the Court regarding what cooperation, if any, would be acceptable.  In any

event, the Court instructed Evans that, before talking with Carp, he should "see if Mr.

Robbenhaar has any problem with Probation producing information to the FBI."  2015 Tr. at

26:14-18 (Court).  Robbenhaar, in turn, objected to the USPO "producing any materials out of

the files to the FBI" and "advised the FBI that [Lee] was not willing to make any further

statements to the FBI without counsel being present."  2015 Tr. at 17:17-25 (Court, Robbenhaar).

No further communications appear to have occurred between the FBI and Evans.  <u>See</u> 2015 Tr. at

17:24-25 (Robbenhaar).

On May 19, 2015, the USPO filed a PROB Form 12A (Report on Offender Under

Supervision - No Court Action Recommended), informing the Court about violation conduct

throughout Lee's term of supervised release.  <u>See</u> Report on Offender Under Supervision at 1,

filed May 19, 2015 (Doc. 41)("Report on Offender").  The Report on Offender contained a

noncompliance summary, prepared by Evans:

> In November and December 2014, the offender had incidents of lapse in sobriety.
> In both instances, the offender admitted to alcohol consumption and cooperated
> with this officer and his counselor in developing a treatment plan.  In one
> instance, the offender's girlfriend was reported missing after consuming alcohol
> with the offender and an unknown female friend.  The girlfriend was later found
> deceased and the offender is implicated as a suspect in the case.

In March 2015, this officer received an incident report from McKinley County Sheriff's office that identified the offender and his brother as involved parties. The family was not forthcoming of the incident until this officer presented the report to them.  According to the report, the offender and his brother were in a physical altercation which was facilitated by alcohol consumption.  It was not certain that the offender was intoxicated at the time of the incident.

During his time under supervision, the offender has displayed a lack of motivation by failing to follow through with GED requirements set by the Court.  This officer has worked with the offender and his family extensively with respect to GED referrals.  He has failed to follow through with this officer's referrals and has provided false information to this officer in regards to his attendance. Specifically, the offender provided false information to this officer by reporting attendance at a local GED program from November 2014, through February 2015. After speaking with the GED coordinator, this officer learned that the offender had not attended since October 2014.

The offender's lack of motivation extends to employment as he has been unable to maintain meaningful employment.  This officer has made job development referrals and the offender fails to show to appointments.  He elects to take on temporary employment opportunities which he obtains through family friends. The decision to work with family friends has led to infrequent employment throughout his supervision.

Instability with employment has led to sporadic restitution payments throughout his term of supervision.  Lately, the offender has discontinued payments altogether.  Since February 2015, the offender has failed to make a restitution payment and is in default.  Through approximately twenty-five (25) months of supervision, the offender has satisfied his $200.00 Special Penalty Assessment and $795.00 of his Court ordered restitution.  His remaining balance is $125,325.87.

Report on Offender at 1-2.  The Court declined to approve the recommendation of no court action, instructing Evans to talk to the United States first.

Less than one month later, on June 10, 2015, the USPO filed its Amended Petition for Revocation of Supervised Release, stating that Lee had violated the six supervised release conditions described in subsection (3) of this opinion's factual background section -- two standard conditions and four special conditions.  See Petition at 1-2.  The USPO alleged that Lee violated standard condition 3, which required Lee to "answer truthfully all inquiries by the

probation officer and follow the instructions of the probation officer," on three occasions. Petition at 1.  First, "[o]n January 29, 2015 and February 23, 2015, the defendant provided false statements regarding his GED attendance."  Petition at 1.  Second, on March 3, 2015, Evans, "received notification from the Program Coordinator at Safe Lifelong Learning advising the defendant was dropped from the GED program due to inactivity."  Petition at 1.  Finally, on May 11, 2015, Evans gave Lee "a verbal directive to report to the [USPO] on May 20, 2015."  Petition at 1.  Lee, however, "failed to report to the U.S. Probation Office as directed."  Petition at 1.

Further, the USPO alleged that Lee violated standard condition 11, which required Lee to "notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer," by failing to notify Evans within seventy-two hours of being in contact with law enforcement officers on three occasions.  Petition at 1-2.  First, "[on] September 13, 2014, deputies with the McKinley County Sheriff's Office responded to Lee's home in reference to a property damage call."  Petition at 1.  Second, "[o]n December 11, 2014, an agent with the Federal Bureau of Investigation made contact with Lee in reference to a murder investigation."  Petition at 1-2.  Finally, "[o]n March 7, 2015, deputies with the McKinley County Sheriff's Office responded to the defendant's home in reference to a domestic disturbance."  Petition at 2.

Additionally, the USPO alleged that Lee had violated four out of the six special conditions of supervised release.  See Petition at 2.  The USPO alleged that Lee violated special condition 1, which required Lee to "participate in and successfully complete a substance abuse treatment program," when "[o]n November 11, 2014, the probation office received notification that the defendant failed to attend a scheduled counseling session at Synergy Behavioral Health Center in Gallup, New Mexico."  Petition at 2.  Further, the USPO alleged that the "probation office . . . received multiple complaints that the defendant [was] failing to participate to the

standard of the program," and "[i]n a May 2015 report from Synergy Behavioral Health Center, the defendant [was] described as not being engaged in the program." Petition at 2.

Regarding Lee's violation of special condition 2, which required Lee to "participate in an educational or vocational program as approved by the probation officer," the USPO alleged that, "[a]fter being referred to Sage Lifelong Learning, a local GED program, in August 2014, the defendant was dropped from the program in January 2015, due to inactivity." Petition at 2. Additionally, the USPO asserted that Lee "re-enrolled in the program in March 2015, but has failed to participate to the standard of the program." Petition at 2.

Special condition 3 required Lee to "refrain from the use and possession of alcohol and other forms of intoxicants. . . .  He must not frequent places where alcohol is the primary item for sale." 2010 Judg. at 4-5.  The USPO asserted that Lee violated this special condition when, "[o]n December 19, 2014, the defendant reported to his probation officer he consumed alcoholic beverages on November 29, 2014, and December 8, 2014." Petition at 2.  Lee also "reported to Synergy Behavioral Health Center in Gallop, New Mexico, on June 6, 2015, to submit to substance abuse testing[]," and "[t]he provider administered two breathe [sic] alcohol tests which registered readings of .063 and .065 alcohol content." Petition at 2.

Finally, the USPO alleged that Lee had violated special condition 4, which ordered him to "make monthly restitution payments of no less than 10%, and no more than 15%, of the defendant's monthly income if the defendant is unable to pay immediately." Petition at 2.  The USPO asserts that Evans "completed an inquiry of the Offender Payment Enhanced Report Access (OPERA) program on June 4, 2015, and [found that it] reflects that the defendant has an outstanding balance of $125,325.87." Petition at 2.  In fact, "the last payment was submitted on January 13, 2015, in the amount of $50.00." Petition at 2.

On July 15, 2015, the Court held a revocation hearing.  See 2015 Tr. at 1.  The Court began by reviewing the six supervised release conditions that, according to the USPO's Amended Petition for Revocation of Supervised Release, Lee allegedly violated.  See 2015 Tr. at 3:3-6:19 (Court).  Lee stated that he was "prepared to admit four of the six" violations.  2015 Tr. at 8:16-18 (Robbenhaar).  He conceded that he had violated the two standard conditions, and the second and third special conditions:

> MR. ROBBENHAAR: I've reviewed this with Mr. Nayback.   The standard conditions, Number 1, not answering truthfully all inquiries by the probation officer; Mr. Lee would admit that.
> The second standard condition, shall notify probation officer within 72 hours of being questioned by law enforcement; he would certainly admit that. . . .
> The specific condition about participating in and successfully completing a substance abuse program, Mr. Lee, at this point is not prepared to admit that particular special condition or a violation of that condition.
> But the next special condition of participating in an education or vocational program, he would admit a violation of that condition.
> And then the next special condition of being ordered to refrain from the use of alcohol, he would certainly admit that special condition.
> The last special condition, Judge, about making monthly restitution payments, Mr. Lee can't admit that. . . .

2015 Tr. at 8:20-9:24 (Robbenhaar).  Lee, therefore, pled guilty to violating the two standard conditions, and the second and third special conditions, see 2015 Tr. at 13:11-15:16 (Court, Lee, Robbenhaar, Nayback), while the United States dismissed the alleged violations of the first and fourth special conditions.  See 2015 Tr. at 10:24-11:3 (Nayback).  The Court accepted the plea, found that Lee had violated supervision, and that there had been violations of supervised release.  See 2015 Tr. at 15:7-16 (Court).  The Court then moved to the second phase of the proceeding -- determining what sentence to impose.  See 2015 Tr. at 15:17-16:5 (Court, Robbenhaar).  The Court began by indicating that, "because of the length of the problems here, as well as some of the serious nature of the contacts he's had with law enforcement," it "was thinking about something at the higher end of the guidelines range."  2015 Tr. at 15:24-16:5 (Court).

- 15 -

Lee maintained that his supervised release violations were "not that egregious just to the extent, certainly, there [were] no new crimes" and that this was the first violation for Lee in over two years of supervised release.  2015 Tr. at 21:21-25 (Robbenhaar).  Lee asserted that his difficulties on supervised release can be traced to the death of his girlfriend at the end of 2014, which "was extraordinarily traumatic and difficult."  2015 Tr. at 16:15-23 (Robbenhaar).  Further, he contended that, although the FBI questioned him regarding his girlfriend's death, "[t]here is a strong alibi, and Mr. Lee was at home at the time, and no charges have resulted." 2015 Tr. at 16:24-17:5 (Robbenhaar).

Regarding the GED program, Lee maintained that he was dropped from the program in January, soon after his girlfriend's death.  See 2015 Tr. at 20:14-18 (Robbenhaar).  He was readmitted in March, but "failed to participate to the standard of the program."  2015 Tr. at 20:16-18 (Robbenhaar).  Lee asserted that "it appears there might be some learning disability, underlying learning issues, and he found the GED program very difficult."  2015 Tr. at 20:19-24 (Robbenhaar).  Lee admitted that he has an alcohol problem, although he contended that the timing of the alcohol violations were consistent with "this traumatic event" in his life.  2015 Tr. at 20:25-21:5 (Robbenhaar).  Nonetheless, Lee maintained that he needs help for his alcohol problem and that he would like to receive treatment.  See 2015 Tr. at 22:13-24 (Robbenhaar); id. at 24:8-10 (Lee).  Lee also stated that he is not a violent person.  See 2015 Tr. at 24:10 (Lee).  In sum, Lee asked the Court to sentence him at the low end of the guidelines, if not a time-served sentence.  See 2015 Tr. at 22:9-17 (Robbenhaar).  He argued that further jail time would not be appropriate in this case for it would be overly punitive.  See 2015 Tr. at 22:24-25 (Robbenhaar). Lee welcomed, however, further supervision, suggesting that with 8 months remaining, a 12-month term of supervision might be appropriate.  See 2015 Tr. at 23:9-14 (Robbenhaar).

The United States offered some further clarification on the FBI's inquiry into the death of Lee's girlfriend.  See 2015 Tr. at 26:2-27:23 (Nayback).  The United States explained that the FBI considers it to be a homicide and that Lee is a suspect.  See 2015 Tr. at 27:2-6 (Nayback).  According to the United States, the "decedent's body was dumped in an arroyo, and the evidence is that it was a homicide.  And [Lee] was the last one seen with her."  2015 Tr. at 27:18-21 (Nayback).  Beyond this information regarding the FBI's homicide investigation into the death of Lee's girlfriend, the United States did not "have any position on these violations today."  2015 Tr. at 27:22-23 (Nayback).

After considering the parties' arguments, the Court then gave a proposed sentence.  See 2015 Tr. at 29:6-25:2 (Nayback).  The Court explained that, "given the serious allegations that are swirling around the defendant, as well as the serious nature of the violations to which he's pled, the Court believes that the punishment set forth in the guidelines is appropriate for this sort of offense," and that a time served sentence, as Lee requests, is not appropriate.  2015 Tr. at 30:21-31:2 (Court).  The Court agreed with Lee that some of the violations were not the most serious, and that "if they'd come earlier in the process, it might be appropriate to sentence at the low end."  2015 Tr. at 31:12-16 (Court).  In the Court's view, however, the cumulative nature of the violations weighed in favor of a sentence at the high end.  See 2015 Tr. at 31:16-32:4 (Court).  The Court noted that Lee was "just not doing very well on supervised release," and was troubled by Lee's failure to contact the probation office after getting contacted by law enforcement on such serious charges, and by Lee's continuing alcohol problem.  2015 Tr. at 31:17-23 (Court).  In light of the violation record, and after considering the relevant factors in 18 U.S.C. § 3553(a) and the policy statements in Chapter 7, the Court gave a proposed sentence of

9-months imprisonment, followed by 24-months supervised release.  See 2015 Tr. at 32:4-33:4 (Court).

The United States did not object to the Court's proposed sentence.  See 2015 Tr. at 35:5 (Nayback).  Lee, however, objected principally on two grounds.  See 2015 Tr. at 35:6-36:14 (Robbenhaar).  First, Lee argued that it was unfair for the Court to base its sentence on the "cumulative nature of the violations" for "[t]hey're cumulative just because . . . a petition was not filed . . . months and months before."  2015 Tr. at 35:7-15 (Robbenhaar).  Further, Lee noted that this petition was his first violation and that a "high end sentence is highly unusual" under such circumstances.  2015 Tr. at 35:24-36:1 (Robbenhaar).  Second, Lee asserted that it was not appropriate for the Court to consider that Lee was a suspect in the FBI investigation as part of its violation analysis.  See 2015 Tr. at 35:16-36:5 (Robbenhaar).

The Court countered that it is "difficult for [Lee] to criticize" his probation officer for not violating him earlier and that, "once we are here, this is quite a number of violations to which he he's admitted."  2015 Tr. at 36:20-23 (Court).  The Court concluded that "the cumulative nature of these violations" was still relevant and significant.  2015 Tr. at 36:15-37:1 (Court).  Second, the Court made it clear that Lee is "presumed innocent of any charges" and that the sentence was being imposed because Lee "failed to bring such a serious charge to the attention of the Court," and not because he was a suspect in the FBI investigation.  2015 Tr. at 37:8-20 (Court).  Lee's failure to bring his contact with law enforcement to the attention of Evans was further compounded by the fact that he had not reported two other contacts he had with law enforcement, one involving a domestic disturbance, and the other property damage.  See 2015 Tr. at 37:8-15 (Court).

The Court then imposed the sentence of 9-months imprisonment, followed by 24-months supervised release.  See 2015 Tr. at 37:21-38:8 (Court); id. at 32:20-35:2 (Court).  The Court ordered Lee to comply with the mandatory and standard conditions of supervised release, along with the following seven special conditions:

> **The defendant must refrain from the use and possession of alcohol and other forms of intoxicants.**
>
> **The defendant must refrain from the use and possession of synthetic cannabinoids or other legally sold designer drugs.**
>
> **The defendant must participate in an educational or vocational program approved by the probation officer.**
>
> **The defendant must not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**
>
> **The defendant must participate in and successfully complete a community-based program which provides education and training in anger management.**
>
> **The defendant must participate in and successfully complete a substance abuse treatment program which may include drug testing, outpatient counseling, or residential placement.  The defendant is prohibited from obstructing or attempting to obstruct or tamper, in any fashion, with the collection, efficiency and accuracy of any substance abuse testing device or procedure.  The defendant may be required to pay a portion of the cost of treatment and/or drug testing as determined by the Probation Office.**
>
> **The defendant shall reside at and complete a program at a Residential Reentry Center for a period of 6 months as approved by the probation officer.[4]**

---

[4]In United States v. Thompson, 2015 WL 151609 (7th Cir. Jan. 13, 2015)(Posner, J.), the Honorable Richard Posner, United States Court Judge of the United States Court of Appeals for the Seventh Circuit, criticizes the manner in which district courts regularly impose conditions of supervised release.  Judge Posner asserts, among other things, that: (i) defendants often are not given advance notice of the conditions of supervised release that a judge is thinking about imposing; and (ii) many judges fail to explain their reasoning for imposing conditions of supervised release, and do not apply the eight 18 U.S.C. § 3553(a) factors, referenced in § 3583(c), to proposed conditions.  See 2015 WL 151609, at *2-4.

In the District of New Mexico, the USPO prepares and delivers a Bruce Memo, named after the United States Court of Appeals for the Tenth Circuit's case of United States v. Bruce, 458 F.3d 1157 (10th Cir. 2006)(Murphy, J.), before sentencing and before violations hearings.

The Bruce Memo lists all conditions -- mandatory, standard, and special -- that the Court is thinking of imposing, so the parties know in advance what the Court is considering and can prepare.  In the Bruce Memo here, Lee was provided with advance notice of the Court's proposed conditions of supervised release before his revocation hearing on July 15, 2015.  See 2015 Tr. at 1.  The Bruce Memo, which the USPO provided to Lee in a timely manner, also refers to the § 3553(a) factors in paragraph one.  Finally, at the July 15th revocation hearing, the Court gave an explanation for why it was imposing each special condition.  See 2015 Tr. at 33:1-40:19 (Court).  Lee did not object to any condition of supervised release.

If Judge Posner is at war with supervised release overall -- and does not think federal courts should be imposing them at all -- the Court may share some of his concerns.  The Court believes that much of what is done on supervised release is law enforcement work and detracts from the federal courts' primary function of adjudicating cases.  The Court is often put in the position of talking to probation officers outside the presence of parties, receiving information about the defendant, approving petitions, and then presiding as judge.  Whether a defendant is using alcohol or where the defendant is living or working -- after he or she has been released from prison -- could be supervised by the Bureau of Prisons just as well or better than this Court, and parole officers are correctional officers in many states, including in New Mexico.

Supervision of a long criminal docket like in New Mexico is extremely time-and-resource consuming, and takes time from traditional judicial functions -- like deciding new cases -- and requires judges to monitor conditions of supervised release sometimes imposed years or decades earlier.  Nevertheless, supervised release remains immensely popular in the political branches, and Congress generously funds the U.S. Probation Office and its work.  See ADMINISTRATIVE OFFICE OF THE U.S. COURTS, FEDERAL CORRECTIONS AND SUPERVISION DIVISION, THE U.S. PROBATION AND PRETRIAL SERVICES SYSTEM 1 (2001), www.ilnpt.uscourts.gov/Probation_and_Pretrial_System.pdf.  As long as Congress and the political branch want the service, the Court must defer to the political branches' expression of the popular will and faithfully perform its delegated function.  Thus, Judge Posner's war on supervised release must be tempered with the recognition that Congress wants district courts to supervise defendants.  And he cannot make it unworkable.  The sentencing cannot become a negotiation process that produces a contract resembling one between Microsoft and a software user, with every word defined.  While the Court often revises the conditions to make them clearer and tailored to the case, the defendant and counsel have to help spot problems; it remains an adversarial process, and the Court has to rely on the attorneys telling it what could be a problem in the particular case before the Court.

The District and the Court already follow some of Judge Posner's directives, but when parties know in advance what the Court is thinking, and do not object to the wording of a condition, it is an undue burden for the Court to independently review each condition and justify on the record each condition -- mandatory and standard -- on the record at the hearing.  If the Court discloses in advance all conditions and justifies on the record each special condition, that careful approval is enough to satisfy Tenth Circuit law and should be enough to satisfy any notion of basic fairness to the defendant, without making the sentencing hearing unduly long or complicated.  See United States v. Bruce, 458 F.3d at 1166-69 (holding that pre-hearing "notice of a special condition is required only where the condition 'implicate[s] a liberty interest, and there [is] a lack of any obvious nexus between the condition and the crime of conviction'"); United States v. Martinez-Torres, 795 F.3d 1233, 1237-38 (10th Cir. 2015)(Hartz, J.)(holding

Judgment at 4-5, filed July 20, 2015 (Doc. 58)("2015 Judg."). See 2015 Tr. at 37: 21-22 (Court); Id. at 33:2-34:19 (Court).

## LAW REGARDING SUPERVISED RELEASE

A district court's decision making with regard to violations of supervised release conditions comes in two phases. First, at sentencing, the court must decide whether to impose a term of supervised release and, if so, how long a term to impose and what conditions to associate with it. Second, while the defendant is on supervised release, if the United States accuses the defendant of violating a condition of supervised release, the Court must determine whether the defendant has violated the conditions, whether to revoke supervised release, and, if so, what punishment to impose for the violation.

1.     **Imposition of Supervised Release.**

A court, "in imposing a sentence to a term of imprisonment for a felony or a misdemeanor, may [and sometimes must] include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment." 18 U.S.C. § 3583(a). As part of a defendant's supervised release, he is legally bound to abide by certain conditions of his release. See 18 U.S.C. § 3583(d). Section 3583 of Title 18 of the United States Code sets forth some of the standard and discretionary conditions that courts shall and may impose as part of supervised release:

> **Conditions of supervised release.** -- The court shall order, as an explicit condition of supervised release, that the defendant not commit another Federal, State, or local crime during the term of supervision and that the defendant not unlawfully possess a controlled substance. The court shall order as an explicit condition of supervised release for a defendant convicted for the first time of a

that, before imposing a special condition, the district court must make an individualized assessment and explain why it is imposing the condition with a statement of "generalized reasons").

domestic violence crime as defined in section 3561(b) that the defendant attend a public, private, or private nonprofit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is readily available within a 50-mile radius of the legal residence of the defendant.  The court shall order, as an explicit condition of supervised release for a person required to register under the Sex Offender Registration and Notification Act, that the person comply with the requirements of that Act.  The court shall order, as an explicit condition of supervised release, that the defendant cooperate in the collection of a DNA sample from the defendant, if the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000.  The court shall also order, as an explicit condition of supervised release, that the defendant refrain from any unlawful use of a controlled substance and submit to a drug test within 15 days of release on supervised release and at least 2 periodic drug tests thereafter (as determined by the court) for use of a controlled substance.  The condition stated in the preceding sentence may be ameliorated or suspended by the court as provided in section 3563(a)(4).  The results of a drug test administered in accordance with the preceding subsection shall be subject to confirmation only if the results are positive, the defendant is subject to possible imprisonment for such failure, and either the defendant denies the accuracy of such test or there is some other reason to question the results of the test.  A drug test confirmation shall be a urine drug test confirmed using gas chromatography/mass spectrometry techniques or such test as the Director of the Administrative Office of the United States Courts after consultation with the Secretary of Health and Human Services may determine to be of equivalent accuracy.  The court shall consider whether the availability of appropriate substance abuse treatment programs, or an individual's current or past participation in such programs, warrants an exception in accordance with United States Sentencing Commission guidelines from the rule of section 3583(g) when considering any action against a defendant who fails a drug test.  The court may order, as a further condition of supervised release, to the extent that such condition--

> **(1)**    is reasonably related to the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D);

> **(2)**    involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in section 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and

> **(3)**    is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a);

any condition set forth as a discretionary condition of probation in section 3563(b) and any other condition it considers to be appropriate, provided, however that a condition set forth in subsection 3563(b)(10) shall be imposed only for a violation

of a condition of supervised release in accordance with section 3583(e)(2) and only when facilities are available.  If an alien defendant is subject to deportation, the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation.  The court may order, as an explicit condition of supervised release for a person who is a felon and required to register under the Sex Offender Registration and Notification Act, that the person submit his person, and any property, house, residence, vehicle, papers, computer, other electronic communications or data storage devices or media, and effects to search at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the person, and by any probation officer in the lawful discharge of the officer's supervision functions.

18 U.S.C. § 3583(d).

Thus, § 3583 specifies standard and discretionary conditions of supervised release, while elsewhere Congress has provided for other conduct which, if committed by a defendant on supervised release, can result in a revocation of supervised release.  Among others, § 3583 provides that the defendant not commit another federal, state, or local crime during the term of supervision, that the defendant not possess any controlled substances, and that the defendant cooperate in the collection of a DNA sample.  See 18 U.S.C. § 3583(d).  Further, § 3583 permits a court to craft special conditions of supervised release that it deems appropriate.  See 18 U.S.C. § 3583(d).  Among those conditions not listed in § 3583 is that supervised release may be revoked if the defendant fails to pay a fine or restitution that the court has imposed.  See 18 U.S.C. § 3613A ("Upon a finding that the defendant is in default on a payment of a fine or restitution, the court may, pursuant to section 3565, revoke probation or a term of supervised release . . . .").

In "determining whether to include a term of supervised release, and if a term of supervised release is to be included, in determining the length of the term and the conditions of

supervised release," the court "shall consider the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)."  18 U.S.C. § 3583(c).[5]

      **2.**    **<u>Revocation of Supervised Release.</u>**

Subsection (e)(3) of § 3583 sets forth the process for revoking supervised release:

**(e)**    **Modification of conditions or revocation.** -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --

. . . .

    (3)    revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve on any such revocation more than 5 years in prison if the offense that resulted in the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case . . . .

---

[5]The Court will discuss these eight specific § 3553(a) factors in the next two sections, which focus on a district court's re-imprisonment of a defendant following revocation of a term of supervised release under § 3583(e).  A district court must consider these same eight factors in both contexts.  It should be noted that 18 U.S.C. § 3583(c) omits § 3553(a)(2)(A) -- which requires a district court to consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense -- as one of the factors to be considered in "determining whether to include a term of supervised release . . . the length of the term and the conditions of the supervised release."  Judge Posner of the Seventh Circuit has recently observed regarding this omission: "From the omission of subsection 3553(a)(2)(A), the court in <u>United States v. Murray</u>, 692 F.3d 273, 280 (3d Cir. 2012), inferred 'that the primary purpose of supervised release is to facilitate the reentry of offenders into their communities, rather than to inflict punishment.'"  <u>United States v. Thompson</u>, 2015 WL 151609, at * 2 (7th Cir. Jan. 13, 2015)(Posner, J.).  The Court agrees with that general observation and goal.

18 U.S.C. § 3583(e).  Further, under § 3583(h), "[w]hen a term of supervised release is revoked

and the defendant is required to serve a term of imprisonment, the court may include a

requirement that the defendant be placed on a term of supervised release after imprisonment."

18 U.S.C. § 3583(h).  See Johnson v. United States, 529 U.S. 694, 712-13 (2000)(holding that

even before the addition of Subsection (h) to the statute in 1994, a plain reading of Subsection

(e)(3) authorized district courts to order terms of supervised release following reimprisonment).

The court must find all violations of supervised release by a preponderance of the evidence,

regardless of whether the violative conduct itself constitutes criminal conduct.  See 18 U.S.C.

§ 3583(e).  This standard is different from the ones that apply to a defendant's violation of

supervised release conditions pending trial -- mere probable cause for criminal violations, and

the clear-and-convincing standard for noncriminal violations.  See 18 U.S.C. § 3148(b)(1).

###    3.    Sentencing Following the Revocation of Supervised Release.

Consistent with § 3583(e)(2), the Tenth Circuit has explained: "When a convicted

defendant violates a condition of supervised release, the sentencing judge may revoke the term of

supervised release and impose prison time."  United States v. Patton, 506 F. App'x 729, 731

(10th Cir. 2012)(Brorby, J.)(quoting United States v. Vigil, 696 F.3d 997, 1002 (10th Cir.

2012)(O'Brien, J.)(citing 18 U.S.C. § 3584(e))).[6]  In doing so, "[t]he judge must consider

[certain] factors in 18 U.S.C. § 3553(a) and the policy statements in Chapter 7 of the Sentencing

Guidelines."    United States v. Patton, 506 F. App'x 729, 731 (10th Cir. 2012)(Brorby,

---

[6]As described in the preceding section, under § 3583(h), "[w]hen a term of supervised
release is revoked and the defendant is required to serve a term of imprisonment, the court may
include a requirement that the defendant be placed on a term of supervised release after
imprisonment."  18 U.S.C. § 3583(h).  See Johnson v. United States, 529 U.S. 694, 712-13
(2000)(holding that even before the addition of Subsection (h) to the statute in 1994, a plain
reading of Subsection (e)(3) authorized district courts to order terms of supervised release
following reimprisonment).  When a defendant violates conditions of his supervised release,
therefore, he can be sentenced to imprisonment followed by further supervised release.

J.)(brackets in original).  See 18 U.S.C. § 3583(e).  The relevant portion of 18 U.S.C. § 3583(e) concerning revocation of supervised release provides that "[t]he court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) . . . revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release."  18 U.S.C. § 3583(e).  The eight relevant § 3553(a) factors are as follows:

> **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> **(2)** the need for the sentence imposed—
>
> > . . . .
> >
> > **(B)** to afford adequate deterrence to criminal conduct;
> >
> > **(C)** to protect the public from further crimes of the defendant; and
> >
> > **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> . . . .
>
> **(4)** the kinds of sentence and the sentencing range established for--
>
> > . . . .
> >
> > **(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28;
>
> **(5)** any pertinent policy statement--
>
> > **(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such

amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  See United States v. Patton, 506 F. App'x at 731 n.2 (explaining that 18 U.S.C. § 3583(e) lists the § 3553(a) factors to be considered).[7]

---

[7]"Section 3583(e) does not list Section 3553(a)(2)(A) among the factors district courts should consider in modifying or revoking supervised release."  United States v. Penn, 601 F.3d 1007, 1012 (10th Cir. 2010)(Baldock, J.).  The omitted section, § 3553(a)(2)(A), provides that, in determining the sentence to be imposed, the district court "shall consider . . . the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).  During Lee's sentencing hearing in this case, the Court mentioned the three factors set forth in § 3553(a)(2)(A), see 2015 Tr. at 29:9-35:4 (Court); however, the Court did so permissibly.

First, the Court did not specifically invoke § 3553(a)(2)(A) of the statute in its short reference to respect for the law, seriousness of the offense, and just punishment.  See United States v. Douglas, 556 Fed. App'x 747, 750 (10th Cir. 2014)(Holmes, J.).  Second, even assuming that the Court considered and relied upon the factors listed in § 3553(a)(2)(A) in imposing Lee's sentence, doing so was not in error.  The Supreme Court has not addressed whether a district court's consideration of a § 3553(a)(2)(A) factor during revocation sentencing is error.  See United States v. Miller, 608 Fed. App'x 707, 709 (10th Cir. 2015)(Baldock, J.).

The Circuits are split on the question.  See United States v. Chatburn, 505 Fed. App'x 713, 717 (10th Cir. 2012)(Matheson, Jr., J.).  The United States Courts of Appeals for the First, Second, Third, Sixth, and Seventh Circuits have concluded that it is not error to consider § 3553(a)(2)(A) factors during revocation sentencing.  See e.g., United States v. Clay, 752 F.3d 1106, 1108-09 (7th Cir. 2014)(Flaum, J.); United States v. Vargas-Davila, 649 F.3d 129, 131-32 (1st Cir. 2011)(Selya, J.); United States v. Young, 634 F.3d 233, 239 (3d Cir. 2011)(Vanaskie, J.); United States v. Lewis, 498 F.3d 393, 399-400 (6th Cir. 2007)(McKeague, J.); United States v. Williams, 443 F.3d 35, 47-48 (2d Cir. 2006)(Kearse, J.).  The United States Court of Appeals for the Fifth and Ninth Circuits, by contrast, have concluded that it is error.  See United States v. Miller, 634 F.3d 841, 844 (5th Cir. 2011)(Garza, J.); United States v. Miqbel, 444 F.3d 1173, 1182 (9th Cir. 2006)(Reinhardt, J.).  The United States Courts of Appeals for the Fourth Circuit initially joined the Fifth and Ninth Circuits, holding that, "[a]ccording to § 3553(a)(2)(A), in devising a revocation sentence the district court is not authorized to consider whether the revocation sentence 'reflect[s] the seriousness of the offense, . . . . promote[s] respect for the law, and . . . provide[s] just punishment for the offense.'"  United States v. Crudup, 461 F.3d 433, 439

(4th Cir. 2006)(Shedd, J.).   Recently, however, the Fourth Circuit limited United States v. Crudup in United States v. Webb:

> A district court's meaningful consideration of the enumerated § 3553(a) factors when imposing a revocation sentence typically will include analysis that furthers the purposes of post-revocation incarceration.   Given that the § 3553(a)(2)(A) factors are closely related to the factors district courts are instructed to consider under § 3583(e), we fail to see how a district court's reference to the § 3553(a)(2)(A) sentencing considerations, without more, would automatically render a sentence unreasonable.   Accordingly, although a district court may not impose a revocation sentence based predominantly on the seriousness of the releasee's violation or the need for the sentence to promote respect for the law and provide just punishment, we conclude that mere reference to such considerations does not render a revocation sentence procedurally unreasonable when those factors are relevant to, and considered in conjunction with, the enumerated § 3553(a) factors.

738 F.3d 638, 641-42 (4th Cir. 2013)(Floyd, J.).   The Ninth Circuit, likewise, later ruled that its holding in United States v. Miqbel, 444 F.3d at 1182, did not make reliance upon a § 3553(a)(2)(A) factor improper per se, explaining:

> [W]e did not set forth a blanket proposition that a court in no circumstances may consider the seriousness of the criminal offense underlying the revocation.   The seriousness of the offense underlying the revocation, though not a focal point of the inquiry, may be considered to a lesser degree as part of the criminal history of the violator . . .

> To ignore the new violation underlying the revocation entirely would be to ignore a key predictor of a violator's potential for reintroduction into society without relapse.   The history of the violator, when combined with the violator's most recent criminal offenses, and particularly when similar to the past transgressions, is indicative of the violator's propensity for recidivism and inability to integrate peacefully into a community.   A history of, for example, drug-related offenses, combined with a drug-related offense underlying revocation, as is the case here, creates a greater likelihood that the violator will relapse into the same or similar criminal activity.   A violator who, after committing an offense and being placed on supervised release for that offense, again commits a similar offense is not only more likely to continue on that path, but also has demonstrated to the court that the violator has little respect for its command.   Because the district court's trust in the violator's ability to coexist in society peacefully has been broken to a greater degree than if the violator had committed a minor offense of a dissimilar nature, greater sanctions may be required to deter future criminal activity.   Consequently, if the nature and the severity of the underlying offense were removed from the equation altogether, the court's ability to predict the violator's potential for recidivism and to punish the violator for the violator's full breach of trust (and,

ultimately, to deter the violator and to protect the public) would be impaired significantly.

United States v. Simtob, 485 F.3d 1058, 1062-63 (9th Cir. 2007)(Ezra, J.)(citations omitted).

 The Tenth Circuit has not taken a position on whether it is error for a district court to rely on § 3553(a)(2)(A) for the revocation of a supervised release term.  See United States v. Miller, 608 Fed. App'x at 709; United States v. Chatburn, 505 Fed. App'x at 717.

> Recent decisions by panels of this Court indicate that the Tenth Circuit has not definitively resolved the question of whether it is error for a district court to consider § 3553(a)(2)(A) factors when revoking an offender's supervised release. See United States v. Chatburn, 505 Fed. App'x 713, 717 (10th Cir. 2012); United States v. Lockhart, 421 Fed. App'x 877, 880 n.1 (10th Cir. 2011).

United States v. Miller, 608 Fed. App'x at 709 (quoting United States v. Douglas, 556 Fed. App'x at 750-51.

 To the extent that the Court relied on the factors set forth in § 3553(a)(2)(A) during Lee's sentencing hearing -- the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense -- it was not in error.  The Court agrees with the result reached by a majority of the Courts of Appeals, that a district court can consider the § 3553(a)(2)(A) factors in revoking supervised release.  A plain reading of § 3583(e) supports that interpretation.  As the Second Circuit has explained, the enumeration in § 3583(e) of specified subsections of § 3553(a) that a court must consider in revoking supervised release does not mean that it may not take into account any other pertinent factor.  See United States v. Williams, 443 F.3d at 47.  Further, in revoking supervised release, a district court must take into consideration, among other things, "'the nature and circumstances of the offense and the history and characteristics of the defendant,' as well as 'the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'"  United States v. Young, 634 F.3d at 239 (citations omitted).  Given the other factors that must be considered, "§ 3583(e) cannot reasonably be interpreted to exclude consideration of the seriousness of the releasee's violation."  United States v. Williams, 443 F.3d at 47-48.  "Indeed, the 'nature and circumstances of the offense,' a mandatory revocation consideration under § 3583, necessarily encompasses the seriousness of the violation of supervised release."  United States v. Young, 634 F.3d at 239.

 The Sixth Circuit persuasively affirmed this view in United States v. Lewis, explaining that the omission of § 3553(a)(2)(A) from § 3583(e) cannot prohibit consideration of the factors enumerated in the former section, for the § 3553(a)(2)(A) factors are "essentially redundant with matters courts are already permitted to take into consideration when imposing sentences for violation of supervised release."  498 F.3d at 400.  The Sixth Circuit found additional support for this conclusion in United States policy statements:

> [I]n the official introduction to the policy statements regarding supervised release, the Sentencing Commission explains that "the sentence imposed upon revocation . . . [is] intended to sanction the violator for failing to abide by the conditions of the court-ordered supervision."  Thus, although violations of supervised release

In particular, a district court must consider the policy statements in Chapter 7 of the

Sentencing Guidelines before imposing a sentence for violations of the conditions of supervised

> generally do not entail conduct as serious as crimes punishable under the §
> 3553(a) regime, revocation sentences are similarly intended to "sanction," or,
> analogously, to "provide just punishment for the offense" of violating supervised
> release. Given that the three considerations in § 3553(a)(2)(A) are consistent with
> considerations already permissible for revocation sentences, the fact that §
> 3583(e) does not require that courts consider § 3553(a)(2)(A) does not mean that
> courts are forbidden to consider that factor, and the fact that a sentencing court
> does consider § 3553(a)(2)(A) is not error.

United States v. Lewis, 498 F.3d at 400 (citations omitted)(brackets in original).

For these reasons, the Court's consideration of, and reference to, the § 3553(a)(2)(A) factors in imposing Lee's sentence for the violation of supervised release is not a procedural error that makes the sentence per se unreasonable. Further, even under Fourth and Ninth Circuit precedent, the sentence was not in error, for the Court did not place undue weight or base its sentence "predominantly on the seriousness of the releasee's violation or the need for the sentence to promote respect for the law and provide just punishment." United States v. Webb, 738 F.3d at 641-42. Rather, the Court merely referenced the § 3553(a)(2)(A) factors in passing, and they were considered in conjunction with the eight § 3553(a) factors explicitly enumerated in § 3583(e). Finally, even if the Court had excluded or changed any reference to the § 3553(a)(2)(A) factors, the Court would have reached the same result, because there is some overlap between other § 3583(e) factors and the factors set forth in § 3553(a)(2)(A). Further, it is difficult if not impossible to not consider the § 3553(a)(2)(A) factors in any sentencing, even if they are not expressly mentioned.

The Court believes the solution and best practice is to always keep in mind what Judge Posner and the Third Circuit have emphasized -- "that the primary purpose of supervised release is to facilitate the reentry of offenders into their communities, rather than to inflict punishment." United States v. Thompson, 2015 WL 151609, at *2 (quoting United States v. Murray, 692 F.3d 273, 280 (3d Cir. 2012)(Fuentes, J.)). Even if the Court considers respect for the law, just punishment, and the seriousness of the offense, it should be mindful that all it does should help the defendant ease back into society after a sometimes lengthy prison sentence, and not try to punish the defendant, although sometimes punishment -- incarceration -- is needed and expressly authorized to get the defendant to do what the Court and the USPO tell him or her to do.

The Court makes one other observation. When Congress and the Court says the word "offense" at a violation hearing, the question is whether it is referring to the underlying offense or to the violation. The Court can consider both, but again, in meeting the goals of supervised release, the emphasis should be on the violation, not the underlying offense. For example, when it considers the "nature and circumstances of the offense," it may consider how the defendant arrived before the Court, but its focus and emphasis in coming up with a disposition, should be on the nature and circumstances of the new violation. If the Court is going to consider the seriousness of the offense, the seriousness of the underlying offense is largely irrelevant, unless the violation is just the same thing as the underlying offense. In any case, the focus and emphasis, if seriousness is considered at all, should be on the seriousness of the new violation.

release.  See United States v. Vigil, 696 F.3d at 1002; United States v. Kelley, 359 F.3d 1302, 1304-05 (10th Cir. 2004)(Ebel, J.).  The Guidelines' commentary is generally an authoritative interpretation of the rules contained therein.  See Stinson v. United States, 508 U.S. 36, 38 (1993).  "[T]he Chapter 7 provisions dealing with violations of supervised release are not mandatory sentencing guidelines; rather, they merely constitute advisory policy statements." United States v. Vigil, 696 F.3d at 1002 (quoting United States v. Contreras-Martinez, 409 F.3d 1236, 1240 (10th Cir. 2005)(Seymour, J.)(citations and quotation marks omitted)).  See United States v. Hurst, 78 F.3d 482, 483 (10th Cir. 1996)(Brorby, J.)("[T]he policy statements regarding revocation of supervised release contained in Chapter 7 of the U.S.S.G.[, including U.S.S.G. § 7B1.4(a),] are advisory rather than mandatory in nature"; a sentencing court simply considers them "in its deliberations concerning punishment for violation of conditions of supervised release.")(citations and internal quotation marks omitted).

   "All discussions of applicable sentences before a district court following the revocation of supervised release should be grounded in the common understanding that the district court may impose any sentence within the statutory maximum."  United States v. Vigil, 696 F.3d at 1002 (quoting United States v. Burdex, 100 F.3d 882, 885 (10th Cir. 1996)(Henry, J.)(citations and quotation marks omitted)).  While district courts are required to consider Chapter 7's policy statements in imposing sentences after revocation of supervised release, "[m]agic words . . . are not required to demonstrate fulfillment of this requirement."  United States v. Vigil, 696 F.3d at 1002 (quoting United States v. Tedford, 405 F.3d 1159, 1161 (10th Cir. 2005)(McKay, J.)(citations omitted)).  "Rather, it is enough if the district court considers § 3553(a) en masse and states its reasons for imposing a given sentence."  United States v. Penn, 601 F.3d at 1011.

## ANALYSIS

The Court comes to this decision based on Lee's numerous violations of the conditions of his supervised release.  There are two analytical steps in sentencing Lee, but Lee waived or conceded one of them.  First, the Court must find that Lee violated the conditions of his supervised release.  Lee waived this finding by pleading guilty to violating the two standard release conditions, and the second and third special release conditions.  As a result, the Court finds that Lee has violated the terms of his supervised release.  The second question -- and the only question before the Court -- is what term of imprisonment, if any, the Court should impose.

The Court has reviewed the violation report and has carefully considered the policy statements of Chapter 7 of the Sentencing Guidelines.  At the time of imposition of sentence, Lee was in Criminal History Category I, and the violation to which Lee admitted is classified as Grade C.  The policy statements in § 7B1.1 advise a range of imprisonment of 3 to 9 months.  Because Chapter 7's policy statements are policy statements and not guidelines, the Court is not bound by them, though it must consider them.  See United States v. Vigil, 696 F.3d at 1002.  Considering the factors set forth in 18 U.S.C. § 3553(a), in particular the number and nature of Lee's violations, and his history and characteristics, the Court revokes Lee's supervised release.  For the reasons stated at the hearing, the Court sentences Lee to 9-months imprisonment and 24-months supervised release.

In determining Lee's sentence pursuant to § 3583(e), the Court has considered the following § 3553(a) factors, which will each be discussed in turn: (i) the offense's nature and circumstances, and Lee's history and characteristics; (ii) the need for the sentence to afford adequate deterrence to criminal conduct, to protect the public from further crimes by Lee, and to provide Lee with needed educational or vocational training, medical care, or other correctional

treatment in the most effective manner; (iii) the sentencing range established under the sentencing guidelines or the policy statements applicable to the violation of supervised release; and (iv) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  See 18 U.S.C. § 3553(a).

I.     **THE OFFENSE'S NATURE AND CIRCUMSTANCES, AND LEE'S HISTORY AND CHARACTERISTICS PUT UPWARD PRESSURE ON THE SENTENCE.**

The sentence imposed on Lee must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  The Court finds that the offense's nature and circumstances and Lee's history and characteristics weigh in favor of a sentence at the high end of the § 7B1.1 advisory range of imprisonment of 3 to 9 months. The Court is especially concerned about the cumulative nature of Lee's violations, his recent involvement with alcohol, his tendency to make false statements, and his disregard of his probation officer's instructions.  Lee's original offense was for two counts of Crime in Indian Country, Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. § 1153 and 18 U.S.C. § 113(a)(6).  See Indictment at 1.  Subsection (3) of this opinion's factual background section describes the original offense, in which Lee lost control of his automobile while intoxicated and collided head-on with another vehicle.  See 2010 Judg. at 2-3; PSR.

Lee had a Criminal History Category of I at the time of his sentencing in 2010, although his contacts with law enforcement before 2010 were somewhat extensive.  In June 2008, Lee was convicted in Navajo Tribal District Court on four counts, including threatening, disorderly conduct, criminal damage, and battery.  See PSR ¶ 53, at 11.  Subsection (1) of this opinion's factual background section describes the circumstances of this conviction.  The Tribal Court sentenced Lee to one year of probation, which was set to expire on February 23, 2010.  See PSR ¶ 53, at 11.  Thus, Lee was on probation for the June 2008 conviction at the time he caused the

head-on automobile collision while intoxicated.  The 2008 Tribal Court conviction imparts no criminal history points.  Previously, Lee was arrested or had interactions with law enforcement officials on six different occasions, involving public intoxication, criminal trespass, criminal nuisance, disturbance, and reckless burning.  See PSR ¶ 55-60, at 11-13.  While the Court certainly does not punish Lee for his 2008 Tribal Court conviction or for his other contacts with law enforcement, it does recognize his long history of contact with the law as part of its analysis under § 3553(a)(1).

Lee has a significant problem with alcohol.  He has repeatedly violated special condition 3 by consuming alcoholic beverages and by failing two breath alcohol tests, which registered readings of 0.63 and 0.65 alcohol content.  See Petition at 2.  Lee also has a history of providing false information to Evans and of not following his orders.  After being referred to a GED program, Lee was dropped from the program because of inactivity.  See Petition at 2.  He twice provided false statements to Evans regarding his attendance at the GED program.  See Petition at 1.  Further, after he was dropped from the program, he failed to report to the USPO as Evans directed.  Petition at 1.  Later, Lee re-enrolled in the GED program, but failed to participate to the program's standard.  See Petition at 2.

Finally, Lee has a demonstrated pattern of not reporting his contact with law enforcement to his probation officer, as the conditions of his release require.  Law enforcement contacted Lee regarding a property damage call and a domestic disturbance.  See Petition at 1-2.  Most troubling to the Court, the FBI contacted Lee regarding its investigation into the murder of his girlfriend.  See Petition at 1-2.  Given Lee's history and characteristics and the offense's nature and circumstances, and particularly his repeated violations of the conditions of his supervised

release, the Court finds that revocation and a term of incarceration is appropriate, followed by supervised release.

Lee criticizes Evans for not violating him earlier, rather than waiting until there was such a long list of alleged violations and then coming to the Court.  If Evans had violated Lee the first time he violated one of his conditions, the Court could have imposed a time served sentence and then, if there were other violations, gradually increased the sentences.  Perhaps there would never have been any more violations and perhaps the Court would have never come to the point that it thought it needed to impose a high-end sentence.  The Court shares some of Lee's concerns, and the thought has crossed its mind that Evans perhaps should have violated Lee earlier, before such a long list of violations occurred.  It is hard to fault Evans, however.  Every probation officer is different and, because Evans is situated in Gallup, New Mexico, and the Court is in Albuquerque, New Mexico, the Court does not know Evans as well as other USPOs whom it sees on a daily basis.

It is clear, however, that Evans was trying to work with Lee and did not violate him for small, technical violations.  In the end, however, while there are different styles of supervision, the Court finds itself where it is -- with a long list of alleged and admitted violations.  It is also clear that Lee is not taking Evan's supervision seriously.  Lee is a threat to the public when he does not take rules seriously, and the Court is concerned that with his alcohol problem and tendency towards violations, he may hurt someone.  In the end, these violations are not Evan's fault; they are Lee's fault.  And the Court has an obligation to impress on Lee the importance of complying with his conditions of supervised release.  The nature and circumstances of the underlying offense, and the violations, as well as Lee's history and characteristics, counsel for a serious sentence.

## II.   THE NEED TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT, TO PROTECT THE PUBLIC FROM FURTHER CRIMES OF THE DEFENDANT, AND TO PROVIDE THE DEFENDANT WITH NEEDED EDUCATIONAL OR VOCATIONAL TRAINING, MEDICAL CARE, OR OTHER CORRECTIONAL TREATMENT IN THE MOST EFFECTIVE MANNER SUGGESTS A SENTENCE AT THE HIGH END OF THE RANGE.

The sentence imposed on Lee must "afford adequate deterrence to criminal conduct."  18

U.S.C. § 3553(a)(2)(B).  "General deterrence of criminal conduct dictates that a clear message be

sent to society that repeated criminal behavior will increase the need for punishment with each

recurrence."   United States v. Thomas, 2015 WL 1268291, at *3 (N.D. Ind. Mar. 19,

2015)(Springmann, J.). The June 2008 conviction carries weight, as it "shows there is a need for

both specific and general deterrence," and demonstrates Lee's "utter disregard for our society's

laws," particularly regarding his use of alcohol.  United States v. Thomas, 2015 WL 1268291, at

*3 (N.D. Ind. Mar. 19, 2015)(Springmann, J.).  The Court finds that incarceration is necessary to

deter future criminal conduct by Lee.

Further, any modification of Lee's supervised release must "protect the public from

further crimes by the defendant."  18 U.S.C. § 3553(a)(2)(C).  See United States v. Goodshield,

2015 WL 1038260, at *6 (N.D. Iowa Mar. 10, 2015)(O'Brien, J.).  Lee admits that, while on

supervised release, he has committed numerous violations of the conditions which the Court

imposed.  In fact, Lee violated all four conditions on multiple occasions.  He also has not shown

any serious willingness to rehabilitate himself in terms of his alcohol problem.  The Court finds

that incarceration, followed by supervised release, is necessary to protect the public from further

crimes by Lee.

Last, any modification of Lee's supervised release must take into account Lee's need for

educational or vocational training, medical care, or other correctional treatment in the most

effective manner.  See 18 U.S.C. § 3553(a)(2)(D).  There is no indication that Lee is in need of

medical care.  Lee is, however, in need of assistance in terms of his alcohol problem and he is also in need of educational training.  Given Lee's difficulties in attending his GED program on supervised release and his tendency to lie to probation officers regarding the program, supervised release is not working, and incarceration is necessary to emphasize upon him the need to comply with the conditions of supervised release.  The Bureau of Prisons will be able to assist Lee in obtaining a GED and in addressing his alcohol problem.  While the Court cannot properly, and does not, incarcerate Lee for rehabilitative purposes, the Court concludes that incarceration may be able to appropriately address Lee's need for educational or vocational training, medical care, or other correctional treatment in an effective manner, leaving the Court to use incarceration to emphasize other § 3553(a) factors.

III.   **THE COURT MUST CONSIDER THE SENTENCING RANGE ESTABLISHED UNDER THE GUIDELINES AND THE POLICY STATEMENTS APPLICABLE TO THE VIOLATION OF SUPERVISED RELEASE.**

As described in the introduction to this opinion's analysis section, the Court is required to consider the pertinent policy statements issued by the United States Sentencing Commission in effect at the time of Lee's sentencing.  18 U.S.C. § 3553(a)(5).  The Court finds two such policy statements relevant to this inquiry.  Classification of Violations, U.S.S.G. § 7B1.1 (Policy Statement), establishes three grades of supervised release violations.  Lee's violations are classified as Grade C violations, which consist of "conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; or (B) a violation of any other condition of supervision."  U.S.S.G. § 7B1.1.

Under U.S.S.G. § 7B1.3(a)(2), "[u]pon a finding of a Grade C violation, the court may (A) revoke probation or supervised release; or (B) extend the term of probation or supervised release and/or modify the conditions of supervision."  U.S.S.G. § 7B1.3(a)(2), Revocation of

Probation or Supervised Release (Policy Statement).  Based on Lee's Criminal History Category of I, Lee's recommended range of imprisonment under the Sentencing Guidelines is 3 to 9 months.  See U.S.S.G. § 7B1.4 (Policy Statement).  The Court thinks time served is too low.  The Court concludes that the guidelines range best reflects the § 3553(a) factors.  In the end, the Court believes a sentence at the high end -- not the low end -- of the range is appropriate, because of the number and seriousness of the violations.

## IV.   THE COURT MUST CONSIDER THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES AMONG DEFENDANTS WITH SIMILAR RECORDS WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.

The final consideration is whether the Court's recommended sentence will result in "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"  18 U.S.C. § 3553(a)(6).  The parties offered no evidence on this issue.  This factor puts upward pressure on the sentence to keep it at least in the guidelines range and, in Lee's case, at the upper end of the range.

In conclusion, the Court has given careful consideration to the violation report, to the factors set forth in 18 U.S.C. § 3553(a), and the policy statements of Chapter 7 of the Sentencing Guidelines. The Court hereby revokes Lee's supervised release, and sentences Lee to 9-months incarceration and 24-months supervised release.  The Court finds, in making this determination, that there must be serious consequences for Lee's repeated and serious violations of the conditions of his supervised release.  The Court finds that a sentence at the high end of the guidelines range is appropriate, because of the number and nature of the violations.  Lee is ordered to comply with the conditions set forth in the Court's judgment.  See 2015 Judg. at 4-5.

The Court has, as the transcript of the hearing and the opinion show, carefully considered the guidelines, but in arriving at its sentence, the Court has also taken account of other

sentencing goals.  Specifically, the Court has considered the guidelines sentencing range that the Commission established for the applicable category of offense committed and the applicable category of defendant.  While Lee wants time served, the number and nature of the violations lead the Court to conclude that the punishment set forth in the guidelines is appropriate for this sort of offense.  The Court then considered the kind of sentence it could impose and the range that the guidelines establish.  After careful consideration of the § 3553(a) factors, the Court concludes that a sentence at the high end of the guidelines range -- 9 months -- is necessary to reflect accurately and fully the § 3553(a) factors.

First, while the Court must and does presume Lee innocent of the swirling rumors that he murdered his girlfriend, Lee should have reported the contact with the FBI to Evans.  He has not been good about reporting his contact with law enforcement, and if he is not going to report this contact -- about being investigated for murder -- he probably is not going to report anything. This reality suggests a sentence at the high end of the guidelines range.  The number and nature of the offenses suggest that a high end sentence is needed to promote respect for the law.  While the Court might have given a low end sentence if there were just one violation and it had come earlier, a just sentence must reflect the number of violations, and that reality puts upward pressure on the sentence.  The number of Lee's violations and the need of the sentence to reflect and afford adequate deterrence -- both specific and general -- put upward pressure on the sentence in Lee's case.

Given his serious alcohol problem, the sentence must protect the public; if he is not going to signal to the Court that he is toeing the line by obeying all of the technical and even minor requirements of supervised release, the Court is concerned that he will blow off the big ones -- such as drinking and driving.  This fear puts upward pressure on the sentence.  The need to avoid

unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct puts pressure to keep the sentence within the guidelines range, but given that the Court generally sentences at the low end of the range unless there are aggravating factors, this factor suggests a low-end sentence.  Here, however, the Court has identified a number of aggravating factors that keep the sentence at the high end of the guidelines range.  The need to effectively provide Lee with needed education or vocational training, and medical care to prevent these problems from occurring in the future, suggests that supervised release can be a substitute for incarceration, and counsels for a low-end sentence.  But given Lee's poor performance to date on supervised release, the Court believes it must, with greater incarceration, emphasize the importance of obeying supervised release and backup Evans.  Lee must understand that he has to cooperate with Evans or he will be back in prison.

In sum, this 9-month sentence fully and effectively reflects each of the factors in § 3553(a).  And while the Court's task, as a district court, is not to come up with reasonable sentences, but to come up with sentences that reflect fairly and adequately the factors in § 3553(a), see, e.g., United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007)(Seymour, J.)("[A] district court's job is not to impose a reasonable sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).")(citations omitted), the Court concludes that the 9-month sentence not only best reflects the factors in § 3553(a), but is also a reasonable sentence.  In sum, the Court concludes that a sentence of 9 months is sufficient, but not greater than necessary, to comply with the purposes of punishment that the Sentencing Reform Act sets forth and that Congress designed supervised release to promote.

**IT IS ORDERED** that Myron Robert Lee is sentenced to 9-months imprisonment, followed by 24-months supervised release.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Damon P. Martinez
  United States Attorney
Kyle T. Nayback
  Assistant United State Attorney
Albuquerque, New Mexico

     _Attorneys for the Plaintiff_

John F. Robbenhaar
  Assistant Federal Public Defender
Albuquerque, New Mexico

     _Attorney for the Defendant_